**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KRISTY COHN and GREG SHENTON,

      Plaintiffs,                                 Case No. 09-12187

v.                                             Hon. Gerald E. Rosen

DETECTIVE DENNIS DeWEESE, MANNIE
RIOPELLE, and JIM THORBURN,

      Defendants.
_____/

KRISTY COHN and GREG SHENTON,

      Plaintiffs,                                 Case No. 09-14341

v.                                             Hon. Gerald E. Rosen

OFFICER ADAM RUFFNER and
OFFICER DAVID TOLER,

      Defendants.
_____/

**OPINION AND ORDER REGARDING**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on       September 30, 2010      

PRESENT:  Honorable Gerald E. Rosen
                  Chief Judge, United States District Court

## I.  INTRODUCTION

Plaintiffs Kristy Cohn and Greg Shenton commenced the first of these two

companion cases in Wayne County Circuit Court on March 10, 2009, asserting federal claims under 42 U.S.C. § 1983 and state-law claims of defamation and intentional infliction of emotional distress against Defendants Dennis DeWeese of the Woodhaven Police Department, Mannie Riopelle of the Michigan State Police, and Jim Thorburn of the Allen Park Police Department.[1]  After this initial suit was removed to this Court on June 5, 2009, Plaintiffs asserted these same claims against two more Defendants, Adam Ruffner and David Toler of the Woodhaven Police Department, in a separate suit that was reassigned to this Court as a companion and consolidated with Plaintiffs' earlier suit. Plaintiffs' claims in these two cases arise from the November 6, 2008 execution of a search warrant at Plaintiffs' apartment in Woodhaven, Michigan, despite the fact that the search warrant authorized a search of a different apartment in a nearby building.

Through the four motions presently pending before the Court, each of the five Defendants seeks an award of summary judgment in his favor on Plaintiffs' federal and state-law claims.  With respect to Plaintiffs' federal claims, Defendants generally argue that they are entitled to qualified immunity because any mistakes they made in the execution of the search warrant were based upon the reasonable belief that they were authorized to take the actions they did in searching Plaintiffs' apartment, and because they promptly ceased their search upon discovering their mistake.  Defendants further

---

[1]Plaintiffs have named other defendants in their initial and amended complaints, but only these three officers remain as parties, and the claims against all other defendants have been dismissed through stipulated orders.

contend that Plaintiffs have failed as a matter of law to produce evidence that could establish each of the elements of their state-law claims. In response, Plaintiffs argue that Defendants knew or should have known before they entered Plaintiffs' apartment that they lacked the proper authority to do so, and that they continued to search Plaintiffs' residence even after it was clear they were in the wrong apartment. Plaintiffs further submit that they have uncovered sufficient evidence to permit their state-law claims to go forward.

Each of Defendants' motions has been fully briefed by the parties. Having reviewed the parties' briefs in support of and opposition to Defendants' motions, as well as the accompanying exhibits and the record as a whole, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendants' motions "on the briefs." *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings on these motions.

## II. FACTUAL BACKGROUND

### A. The Parties

Plaintiffs Kristy Cohn and Greg Shenton reside in an apartment unit at 23221 Williamsburg Circle, Apartment G, in Woodhaven, Michigan. At the time of the events

giving rise to this case, they were engaged to be married.[2]  Their apartment is on the

second floor of a multi-unit building.  This building, in turn, is part of a 24-building

apartment complex, with 12 pairs of similar-looking buildings that are attached to each

other at 90-degree angles.

Five police officers remain as Defendants in these two companion cases.

Detective Dennis DeWeese and Officers Adam Ruffner and David Toler are employed by

the Woodhaven Police Department.  Lieutenant Mannie Riopelle works for the Michigan

State Police.  Finally, Officer Jim Thorburn is employed by the Allen Park Police

Department.  Each of these Defendant officers was present at the November 6, 2008 raid

of Plaintiffs' apartment.  Defendants DeWeese, Riopelle, and Thorburn participated in the

raid as members of the Downriver Area Narcotics Organization ("D.R.A.N.O."), a multi-

jurisdictional task force that investigates suspected narcotics-related activity.  Defendants

Ruffner and Toler were asked to accompany the D.R.A.N.O. team as they executed the

search warrant and mistakenly entered Plaintiffs' apartment, with Officer Ruffner acting

as the uniformed police presence outside the apartment, and Officer Toler serving as the

K-9 officer accompanied by Jax, a dog trained to detect the odor of narcotics.

**B.**     **The Investigation Leading to the Issuance of the Search Warrant**

Sometime in October of 2008, Defendant Ruffner received a tip about suspected

drug activity at 23231 Williamsburg Circle, Apartment G, in Woodhaven, with the tipster

_____

[2]Plaintiffs are now married, and Plaintiff Kristy Cohn is now known as Kristy Shenton.

identifying Stephen Shaw as the individual engaged in this activity. Defendant Ruffner relayed this information to Defendant DeWeese, and further advised the detective that the suspect drove a dark blue Chevy Tahoe and that he picked up a pound of marijuana every Thursday evening. Following up on this tip, Detective DeWeese confirmed that the suspect resided at 23231 Williamsburg Circle, Apartment G.

On October 22, 2008 at approximately 2:00 a.m., Detective DeWeese brought Defendant Toler, the Woodhaven Police K-9 officer, and his dog Jax to what he believed was Shaw's apartment.[3] Officer Toler and his dog went into the apartment building and up the stairs to Apartment G, while DeWeese remained on the ground floor in the common area of the building. Upon returning from the apartment, Officer Toler reported that Jax had alerted to the odor of narcotics on the door.

On November 6, 2008 at approximately 1:00 a.m., DeWeese and Toler returned to the same location with Toler's dog.[4] Once again, Toler took his dog to the door of Apartment G, and Jax again alerted to the odor of narcotics. In his investigative reports of his two visits with Toler, DeWeese consistently recorded the target of his and Toler's investigative efforts as 23231 Williamsburg Circle, Apartment G. (*See* Defendant

---

[3]As discussed below, DeWeese has testified that he later came to believe that he and Toler mistakenly went to Plaintiffs' apartment at 23221 Williamsburg Circle, Apartment G, rather than Shaw's apartment at 23231 Williamsburg Circle, Apartment G. Plaintiffs, however, maintain that issues of fact remain as to which apartment (Shaw's or Plaintiffs') DeWeese and Toler actually visited that night.

[4]Again, DeWeese has testified that although he thought he was going to Shaw's apartment at 23231 Williamsburg Circle, he and Toler actually returned to Plaintiffs' apartment at 23221 Williamsburg Circle.

DeWeese's Motion, Ex. B.)   Moreover, DeWeese testified at his deposition that upon entering the apartment building with Toler to conduct his investigation, he checked the address posted outside the building to confirm that it was 23231 Williamsburg Circle — *i.e.,* Shaw's address.  (*See* Defendant DeWeese's Motion, Ex. A, DeWeese Dep. at 78-79.)[5]

## C.    The Search Warrant for 23231 Williamsburg Circle, Apartment G

Following this investigation, Detective DeWeese prepared and signed an affidavit for a search warrant.  (*See* Defendant DeWeese's Motion, Ex. D, 11/6/2008 Affidavit.)  In this affidavit, DeWeese stated that he was "currently investigating controlled substance activities out of 23231 Williamsburg Cir Apt G," and he recounted (i) the tip he had received from an unidentified individual with personal knowledge that "narcotic activity was being conducted at 23231 Williamsburg Cir Apt G," and (ii) the two visits he and Officer Toler had made to the apartment, with Toler's dog Jax "indicat[ing] positive for the presence of narcotic order on the door" during each visit.  (*Id.* at 1.)  Finally, DeWeese identified Stephen Shaw as the "known subject residing in the residence at 23231 Williamsburg Cir Apt G."  (*Id.* at 2.)  In all, Detective DeWeese referred to 23231 Williamsburg Circle nine times in this affidavit.

On November 6, 2008, a state court judge signed a warrant authorizing a search of

_____

[5]Apart from the two visits with Officer Toler, it does not appear from the record that Detective DeWeese conducted any surveillance of suspect Shaw or his apartment to watch for drug-related activity.  Rather, DeWeese testified that he simply passed through the parking lot outside the apartment on a couple of occasions to confirm that Shaw's vehicle was parked there.

23231 Williamsburg Circle, Apartment G.  (*See* Defendant DeWeese's Motion, Ex. E, Search Warrant.)  The warrant included the following description of the place to be searched:

> 23231 Williamsburg Cir Apt G, City of Woodhaven, County of Wayne, State of Michigan.  Apartment G is a single family style apartment on the second floor located at 23231 Williamsburg Cir Woodhaven MI.  The main door to 23231 Williamsburg Cir Woodhaven MI is wood and glass.  The main door faces south[,] the numerals 23231 are affixed above the door and [are] black in color.  The apartment has white brick and white siding with a black roof.  The building is 2 stories.  Further, the door to apartment G is a steel door, brown in color and faces east.  The letter G is affixed in the middle of the door and is gold in color.  Also to be searched are any safes, lock boxes, storage units and vehicles associated with 23231 Williamsburg Cir Apt G, Woodhaven Michigan 48183 . . . .  Further, any persons found in 23231 Williamsburg Cir Apt G Woodhaven Mi. and specifically Stephen Samuel Shaw.

(*Id.*)

The exhibits provided by Plaintiffs indicate that this description of 23231 Williamsburg Circle, Apartment G is accurate in most (but not all) respects.  The exterior of the building is light gray brick with white siding.  The building faces southwest, and the main door is made of glass in a silver metal frame.  The address numerals, 23231, are affixed to the left of the door, and are gold in color and mounted on a wooden placard.  Apartment G is on the second floor of the building, and has a brown door with a gold letter "G" affixed to the middle of it.

In contrast, Plaintiffs' apartment at 23221 Williamsburg Circle, Apartment G, differs in appearance from its counterpart at 23231 Williamsburg Circle (and from the description in the warrant) in certain respects.  The outward appearance of the apartment

building is similar, featuring light gray brick with white siding. The building faces southeast, and its entry door is made of glass in a silver metal frame. The address numerals, 23221, are affixed to the right of the main door, and are gold in color and mounted on a wooden placard. Plaintiffs' apartment is on the second floor of the building. The door to the apartment faces northeast, appears to be burgundy or reddish-brown in color, and has a black letter "G" affixed to it.

**D.      The Execution of the Search Warrant**

On November 6, 2008 at around 5:20 p.m., a D.R.A.N.O. raid team — consisting of Defendants DeWeese, Riopelle, and Thorburn, along with three other officers who are no longer parties to this suit — prepared to execute the search warrant for 23231 Williamsburg Circle, Apartment G. Detective DeWeese conducted a pre-raid briefing of the D.R.A.N.O. team, and prepared a raid plan that was shown to and reviewed by each officer. The plan recited the address to be searched as 23231 Williamsburg Circle, Apartment G, and DeWeese testified that he verbally announced this same address to the D.R.A.N.O. team at the briefing. In addition, DeWeese was in possession of the search warrant, but he could not recall whether he circulated the warrant to the other officers during the briefing. After the briefing, the team then traveled to the Woodhaven Police Department, where they met up with Woodhaven Officers Ruffner and Toler, and Detective DeWeese briefed the two officers about the raid.

The D.R.A.N.O. raid team — wearing raid gear with vests stating "POLICE" on the front and back — then drove to their destination in a van, arriving at around 7:00 p.m.

in a parking lot shared by buildings 23221 and 23231, as well as four other buildings in the complex.[6]  Officers Toler and Ruffner drove separately to the apartment complex, with Toler and his dog Jax arriving at about the same time as the D.R.A.N.O. team and Ruffner arriving shortly thereafter.  DeWeese parked the D.R.A.N.O. van in the parking lot behind what he believed to be Shaw's Chevy Tahoe, and the raid team proceeded to enter 23221 Williamsburg Circle — *i.e.,* the building in which Plaintiffs, and not Shaw, resided.

The six-member D.R.A.N.O. team went through the main door of the apartment building[7] and took positions outside Apartment G, Plaintiffs' apartment.  The team knocked on the door, announced that they had a warrant, knocked again, and then waited approximately 15 to 20 seconds.  When they received no reply, Lieutenant Riopelle gave the order to ram the door, and the officers broke open the door and entered Plaintiffs' apartment.

At the time of the raid, Plaintiff Cohn had just finished taking a shower.[8]  As she turned off the water, she heard a knock on the door, and she wrapped towels around her hair and body and walked toward the door.  When she got within approximately 20 feet of

---

[6]As noted earlier, the buildings are grouped in connected pairs.  Buildings 23221 and 23231 are not a connected pair, but instead are part of two separate (but nearby) pairs of buildings that share a common parking lot with another pair of buildings.

[7]Detective DeWeese testified that the main door to the building was unlocked, but Plaintiff Shenton asserts in an affidavit that this door is kept locked, and that entry is possible only with a key or if a tenant buzzes the visitor in.

[8]Plaintiff Shenton was not at home.

the door, it was broken open and the raid team entered, with guns drawn and with all but one of the officers wearing masks. DeWeese ordered Cohn to put her hands up, and as she did so, the towel around herself fell off and she was completely naked.[9] Cohn testified that she remained naked and standing in front of the officers for about a minute, until one of them directed her to sit down on a couch in the family room. Cohn further testified that she remained unclothed for about three to five more minutes as one of the officers sat down next to her and began to question her, after which another officer retrieved a robe for her to wear. She was never handcuffed.

The raid team quickly secured the apartment and checked for other occupants (there were none), and then DeWeese returned to the D.R.A.N.O. van to retrieve a raid bag and the search warrant. During this same time period, Officer Toler received a signal that the apartment was clear, and he and his dog Jax entered the apartment to check for the odor of narcotics.[10] Officer Toler was instructed to take Jax to the bedroom, where the dog gave a positive indication for the odor of narcotics on a dresser at the foot of the bed. Toler reported this positive alert to the D.R.A.N.O. officers, and then left when he was told that no further assistance was needed. Finally, the remaining officer on the

---

[9]Detective DeWeese testified that Cohn was wearing pants and that, upon his order, she put her hands partly up while holding onto her towel with her elbows. DeWeese further testified that he ordered Cohn to keep the towel on. Similarly, in his incident report, DeWeese stated that "[a]t no time was COHN without clothing and/or exposed." (Defendant DeWeese's Motion, Ex. B, Suppl. Incident Report.)

[10]Officer Toler testified at his deposition that the apartment he entered was the same one where he and Jax had gone on the two prior occasions to conduct dog sniffs outside the apartment door.

scene, Officer Ruffner, stayed outside the door of the apartment, arriving at this position shortly after the D.R.A.N.O. team entered the apartment, and remaining outside the door to provide security for approximately ten minutes.[11]

As Detective DeWeese returned from the D.R.A.N.O. van and re-entered Plaintiffs' apartment, he noticed a framed engagement portrait of Plaintiffs leaning against the living room wall. DeWeese realized that the man in this picture did not resemble suspect Stephen Shaw, and he asked Ms. Cohn to identify the man in the photograph. Cohn responded that the man was her fiancé, Plaintiff Shenton, and she confirmed that Shenton resided in the apartment with her. DeWeese testified that at that point, he went downstairs to check the address on the outside of the apartment building, and he discovered that this address, 23221 Williamsburg Circle, was not the address listed in the search warrant.

According to DeWeese, upon making this discovery, he went back upstairs to Plaintiffs' apartment and reported to the officer in charge, Lieutenant Riopelle, that the apartment raided by the D.R.A.N.O. team was not the apartment identified in the search warrant. DeWeese further advised Riopelle, however, that the apartment the team had entered was the same apartment that Officer Toler and his dog had visited on the two prior occasions when the dog had alerted positive to the odor of narcotics on the

---

[11]Officer Ruffner testified that he had been told that the officers were conducting a raid on Stephen Shaw's apartment. Ruffner further testified that he knew where Shaw lived, and that, upon arriving at the scene shortly after the D.R.A.N.O. team, he could see that the raid team had gone into a different apartment. He agreed that this raised a question in his mind, but he did not mention this to the other officers.

apartment door.  During this discussion, DeWeese and Riopelle were told that Toler's dog had given a positive indication for the odor of narcotics on a dresser in Plaintiffs' bedroom.  DeWeese testified that based on this information, Lieutenant Riopelle made the decision that the D.R.A.N.O. team members should remain in Plaintiffs' apartment and continue their search.[12]

After Riopelle determined that the search should continue, DeWeese and the other D.R.A.N.O. team members, including Officer Thorburn, searched Plaintiffs' bedroom for drugs.  In the course of this search, the officers pulled drawers from the dresser where Officer Toler's dog had alerted to the odor of narcotics, and they also searched the closet and looked under the mattress.  No drugs were found in the search.  After about five to ten minutes, the officers were instructed by Lieutenant Riopelle to cease their search, and to "[p]ut everything back" and go.  (*See* Defendant Thorburn's Motion, Ex. B, Thorburn Dep. at 30-31.)

In all, Plaintiff Cohn estimated that the raid of her apartment lasted about 30 minutes.  Plaintiffs have produced photographs showing that their apartment was left in disarray, and Plaintiff Cohn testified that the door to the apartment was broken and would not close.  In addition, the D.R.A.N.O. team removed some papers from the apartment

---

[12]Although Lieutenant Riopelle was deposed in this case, he invoked his Fifth Amendment privilege against self-incrimination and refused to answer any questions about the incidents giving rise to Plaintiffs' claims.  Indeed, Riopelle refused to answer any questions about his employment with the Michigan State Police, immediately invoking his Fifth Amendment privilege when asked at the outset of his deposition whether he was or had ever been employed.

during the search.

**E.      The Report of the Raid in a Local Newspaper**

On November 11, 2008, a local newspaper, the News-Herald, published an article about the search of Plaintiffs' apartment entitled "Police raid hits wrong apartment." (Defendant DeWeese's Motion, Ex. H.)  This report included a description of the incident by Plaintiff Cohn, who stated that she was nude for about three to five minutes during the raid, and it was accompanied by a photograph showing Plaintiffs' apartment in disarray. The story also quoted Lieutenant Darwin Scott of the Michigan State Police,[13] who (as noted in the article) did not participate in the raid, but who stated that upon speaking to members of the raid team, he was told (i) that Plaintiff Cohn was wearing blue jeans and was not nude, and (ii) that the officers had probable cause to search Plaintiffs' residence because a police dog had alerted on two occasions to the presence of drugs in the apartment, and because the police had received information from a credible source. Finally, the caption of the photograph accompanying the article — which, as noted, showed the bedroom of Plaintiffs' apartment with the dresser and closet doors open and clothes strewn about the floor — noted Plaintiffs' claim that "parts of their apartment were ransacked," but stated that "[t]eam members said they restored the apartment before leaving."  (*Id.*)

## III.  ANALYSIS

---

[13]Lieutenant Scott was named as a defendant in Plaintiffs' first amended complaint, but was later dismissed from the case by stipulated order dated April 15, 2010.

**A.     The Standards Governing Defendants' Motions**

Through the present motions, each of the five remaining Defendants seeks summary judgment in his favor on each of Plaintiffs' claims, including those arising under federal and Michigan law.  Under the Federal Rule governing these motions, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006).  Yet, so long as a summary judgment motion is "properly made and supported," the nonmoving party "may not rely merely on allegations or denials in its own pleading," but "must — by affidavits or as otherwise provided in [Rule 56] — set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e)(1).  Finally, "the mere existence of a scintilla of

evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted). With these standards in mind, the Court turns to Defendants' motions.

**B.      Plaintiffs' Federal § 1983 Claims Arising from the Entry into and Search of Their Apartment and the Seizure of Papers from the Apartment.**

Although Count I of Plaintiffs' first amended complaint cuts a wide swath through the U.S. Constitution, alleging deprivations of rights protected under the First, Fourth, Fifth, Eighth, Ninth, Tenth, and Fourteenth Amendments, it is clear from Plaintiffs' submissions in response to Defendants' motions that each of Plaintiffs' federal § 1983 claims rests upon the Fourth Amendment guarantees against unreasonable searches and seizures and against warrantless entries into private homes. In particular, Plaintiffs allege (i) that Defendants unlawfully entered their apartment (as well as the apartment building) without a warrant, (ii) that, following this unlawful entry, Defendants acted unreasonably in the ensuing search of Plaintiffs' apartment by forcing Plaintiff Cohn to remain nude during a portion of this search, and by continuing their search and failing to leave the apartment after they knew or should have known that they lacked the proper authority to enter the apartment, and (iii) that Defendants unlawfully seized papers from the apartment without a legal basis for doing so.

In seeking summary judgment in their favor on these § 1983 claims, Defendants appeal to the doctrine of qualified immunity. Under this doctrine, a governmental defendant is shielded from liability for a federal constitutional violation unless "the

violation involves clearly established constitutional rights of which a reasonable person would have known." *Burchett v. Kiefer,* 310 F.3d 937, 942 (6th Cir. 2002) (internal quotation marks and citations omitted). The availability of qualified immunity turns upon a two-step inquiry, under which the court must first "determine whether, based on the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred." *Burchett,* 310 F.3d at 942. "If the court finds a constitutional violation, it must then consider whether the violation involves clearly established constitutional rights of which a reasonable person would have known." 310 F.3d at 942 (internal quotation marks and citations omitted).

### 1. The Initial Entry into Plaintiffs' Apartment

The Court turns first to Plaintiffs' claim that the Defendant officers unlawfully entered their apartment without a warrant that properly authorized this entry.[14] Although

---

[14]In their responses to Defendants' motions, Plaintiffs address what they view as a separate constitutional violation when Defendants entered the 23221 Williamsburg Circle apartment building on their way to Plaintiffs' apartment. As Plaintiffs point out, the Sixth Circuit has recognized that tenants have a reasonable expectation of privacy in an apartment building's common areas that are not open to the general public. *See United States v. Carriger,* 541 F.2d 545, 549 (6th Cir. 1976).

The Court deems it unnecessary to address this separate theory in the present opinion. First, while Plaintiff Shenton has stated in an affidavit that, as a general rule, the main door to the apartment building is kept locked, Detective DeWeese testified that the door was unlocked when the D.R.A.N.O. team entered the building, and nothing in the record calls this testimony into question. If a building is unlocked, the reasonable expectation of privacy recognized in *Carriger* does not exist. *See United States v. Dillard,* 438 F.3d 675, 682-84 (6th Cir. 2006). Next, and more importantly, if a Defendant officer in this case can establish his entitlement to qualified immunity for his entry into Plaintiffs' apartment, this officer surely would also be entitled to qualified immunity from any liability arising from his entry into the apartment building. Thus, there is no need to separately address the latter question, because it is subsumed

16

the D.R.A.N.O. raid team had secured a warrant, it authorized only the entry and search of an apartment in a neighboring building, and not Plaintiffs' apartment. Under these circumstances, the first prong of the qualified immunity inquiry is readily resolved, because "it is well established that a warrantless search and seizure is unreasonable," and thus violates the Fourth Amendment, "absent probable cause and exigent circumstances." *Pray v. City of Sandusky,* 49 F.3d 1154, 1158 (6th Cir. 1995). The Defendant officers did not have a warrant to search Plaintiffs' apartment, and they have not identified any exigent circumstances that would overcome the need to obtain one. Consequently, Plaintiffs' Fourth Amendment rights were violated by virtue of the warrantless entry into their apartment.

Nonetheless, Defendants may still establish their entitlement to qualified immunity because the courts have "recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Maryland v. Garrison,* 480 U.S. 79, 87, 107 S. Ct. 1013, 1018 (1987). More specifically, in a case involving facts somewhat analogous to those presented here — namely, a raid upon the lower level of a duplex pursuant to a warrant that authorized a search of the upper level of the duplex — the Sixth Circuit described the principles that should govern a court's qualified immunity inquiry:

> The defendant[] [officers] do not contest, for the most part, that the actions complained of [*i.e.,* a warrantless entry into the wrong residence]

---

within the Court's analysis of the former issue.

did in fact occur.  Rather, the officers contend that these actions are protected by their qualified good-faith immunity.  The officers contend that because these actions took place as a result of their mistake of fact under the circumstances, i.e., they thought that they were in fact executing the search warrant on the correct residence, a reasonable officer in the defendants' position would not understand that their actions were in fact violating the plaintiffs' clearly established constitutional rights.  Thus, we must determine whether the summary judgment record shows that any reasonable officer in the defendants' position would know that his conduct at issue violated the [plaintiffs'] clearly established rights.

*Pray,* 49 F.3d at 1159.

Upon considering this question in *Pray,* the court found that the defendant police officers were entitled to qualified immunity from liability for their initial, forcible entry into the plaintiffs' residence.  *See Pray,* 49 F.3d at 1159.  In that case, three of the five members of the raid team had participated in the execution of a prior search warrant approximately six weeks earlier, and had entered the correct (upper) level of the duplex on that earlier occasion.  Despite this prior knowledge that might have alerted these three officers to their mistake, the Sixth Circuit concluded that the raid team's mistaken entry into the plaintiffs' residence while executing a second search warrant was protected by qualified immunity:

The plaintiffs contend that since several of the defendants involved in the raid had also been present during the previous warrant execution, the forcible entry into their home was clearly unreasonable.  On the other hand, the officers contend that, under the circumstances, their mistake in forcibly entering the [plaintiffs'] home was a reasonable one.  The defendants were in the process of carrying out a raid at night on the premises of a suspected drug dealer.  The officers simply claim that they missed the correct door.  We agree that a reasonable officer in the defendants' position could have believed that he was initially entering the correct residence described on the warrant.  Police officers are regularly forced to make critical decisions

under extreme pressure — decisions which may seem much easier after facts have unfolded and time for reflection has been afforded. Given the circumstances at the time of entry, it appears that the officers had to make a quick judgment in what was initially a tense situation. At the time the officers entered the [plaintiffs'] home, it was dark, vision was poor, and any delay could have been potentially detrimental to an arrest of [the true suspect] and seizure of evidence. The circumstances surrounding the search six weeks earlier, however, were significantly different — it was not a raid, it was daylight, and [the suspect's] door leading to the stairs was open to the officers. Thus, we conclude that the initial mistake in entering the [plaintiffs'] home was a reasonable one under the circumstances, and therefore, protected by qualified immunity.

*Pray,* 49 F.3d at 1159 (internal quotation marks and citation omitted).

The reasoning in *Pray* guides the Court's inquiry in the present case. Specifically, the Court must determine whether the Defendant officers' entry into Plaintiffs' apartment, while mistaken, was reasonable under the circumstances. The actions of each Defendant officer must be considered separately, because "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf,* 601 F.3d 640, 650 (6th Cir. 2010). Moreover, while the qualified immunity inquiry turns upon the "objective (albeit fact-specific) question whether a reasonable officer could have believed [his actions] to be lawful[] in light of clearly established law," this objective standard must be applied by reference to the information that each individual Defendant officer possessed at the time. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S. Ct. 3034, 3040 (1987). Against this backdrop, the Court addresses in turn the entitlement of each Defendant to qualified immunity for the initial entry into Plaintiffs' apartment.

### (a)  Detective DeWeese

The Court begins with Detective DeWeese, who conducted the investigation leading to the issuance of the search warrant for 23231 Williamsburg Circle, Apartment G, and who prepared the affidavit in support of this warrant. Plainly, then, DeWeese possessed the most information and knowledge from which the D.R.A.N.O. raid team might have realized that they were entering an apartment different from the one specified in the search warrant. Yet, as a threshold matter, the Court must address a dispute as to precisely what knowledge and information DeWeese possessed at the time.

Detective DeWeese has testified that he began his investigation with a tip that an individual by the name of Stephen Shaw was engaging in illegal narcotics activities at 23231 Williamsburg Circle, Apartment G. After confirming that this individual resided at this address and that he drove a dark blue Chevy Tahoe, DeWeese made arrangements for Officer Toler and his dog, Jax, to visit this apartment and check for the odor of narcotics on the apartment door. DeWeese accompanied Toler on each of his two visits with Jax, and the dog alerted to the odor of narcotics on each of these visits. DeWeese testified that he believed he had taken Officer Toler to Shaw's apartment at 23231 Williamsburg Circle, but that he later realized, during the course of the raid, that he had mistakenly directed Toler to Plaintiffs' apartment at 23221 Williamsburg Circle. Likewise, Officer Toler testified that his two prior visits with Jax were to the same apartment — namely, Plaintiffs' apartment — that the D.R.A.N.O. team raided on the evening of November 6, 2008.

In Plaintiffs' view, however, there is ample circumstantial evidence in the record

to raise issues of fact as to the accuracy of Detective DeWeese's testimony on this point. By Plaintiffs' count, DeWeese recorded Shaw's address, 23231 Williamsburg, a total of 33 times in the paperwork he completed during his investigation, including 10 times in his original and supplemental incident reports, 14 times in the affidavit for the search warrant, 6 times in the draft search warrant prepared for the judge's signature, once in the raid plan, and twice in a "Deconfliction Event Form" he prepared in connection with the raid. In addition, DeWeese testified that on his first visit to Shaw's apartment, he checked the address posted outside the building to confirm that he was entering 23231 Williamsburg Circle, explaining that he "was not familiar" with this location. (DeWeese Dep. at 79.) Similarly, he testified that when he recorded Shaw's address, 23231 Williamsburg Circle, in his incident report as the location of his investigation, this statement was "not false" and he "believed [it] to be true" when he wrote it. (*Id.* at 100.) Finally, the search warrant prepared by DeWeese includes details about the subject premises that are accurate as to Shaw's apartment but not as to Plaintiffs' — most notably, that the door to the apartment has a gold letter "G" affixed to it (as opposed to the black letter "G" affixed to Plaintiffs' door). From all of this, Plaintiffs contend — and the Court agrees — that a trier of fact could reasonably conclude that Detective DeWeese's prior visits with Officer Toler occurred precisely as he described them in his reports and other contemporaneous writings — namely, with the officers visiting Shaw's apartment at 23231 Williamsburg Circle on both of these occasions. Accordingly, the Court must view the record in this light when deciding whether Detective DeWeese made

21

a reasonable mistake in entering Plaintiffs' apartment.

Under this record, viewed most favorably to Plaintiffs as the non-moving parties, the Court cannot say as a matter of law that Detective DeWeese is entitled to qualified immunity. Rather, if a jury were to find that DeWeese's and Toler's prior visits were to Shaw's apartment, and not Plaintiffs', the jury could further conclude that a reasonable officer armed with the information known to DeWeese would have known that the entry into Plaintiffs' apartment was mistaken and unauthorized. The most recent of DeWeese's and Toler's prior visits, after all, was in the early morning hours of November 6, 2008, the very same day that the D.R.A.N.O. team raided Plaintiffs' apartment. In *Pray,* 49 F.3d at 1159, by contrast, the earlier search had been conducted six weeks prior to the raid giving rise to the plaintiffs' claims. Moreover, while the court in that case cited the "significantly different" circumstances surrounding the prior search and the raid, *Pray,* 49 F.3d at 1159, the conditions during DeWeese's and Toler's prior visit and during the raid were substantially the same, with both being conducted in darkness[15] and just a few hours apart. Finally, if a jury were to discredit DeWeese's testimony regarding his and Toler's prior visits to Plaintiffs' apartment, it could infer that DeWeese was offering an after-the-fact justification in an effort to conceal a blunder that he promptly realized, upon entering Plaintiffs' apartment, should have been obvious to him and readily avoidable.

---

[15]The raid team arrived at Plaintiffs' apartment at around 7:00 p.m. on November 6, 2008, well after sunset at that time of year. DeWeese confirmed at his deposition that it was dark when he and the raid team entered Plaintiffs' apartment. (*See* DeWeese Dep. at 158.)

Other factors cited in *Pray* as supporting a finding of objective reasonableness are not present here. In that case, the plaintiffs' and the suspect's duplexes shared a common vestibule, with "one door opening immediately to a flight of stairs by which the [suspect's] upper flat is reached, and one door opening directly into the lower flat occupied by the [plaintiffs]," and with "[n]either door in the vestibule . . . identified by number or name." *Pray,* 49 F.3d at 1156. In addition, the court cited the need for the defendant officers "to make a quick judgment in what was initially a tense situation," and observed that "it was dark [and] vision was poor" as they made this on-the-spot decision. Here, in contrast, Shaw's and Plaintiffs' apartments were in entirely different buildings, accurately and correctly labeled with different addresses, and nothing in the record indicates that DeWeese and the other members of the D.R.A.N.O. team confronted a situation in which they had to "make a quick judgment" under tense or otherwise difficult conditions in order to ascertain the proper building to enter. Rather, the officers presumably were free to take whatever time they needed in order to ensure that they raided the correct residence. *See Smith v. City of Detroit,* 238 F. Supp.2d 896, 901 (E.D. Mich. 2003) (citing this same absence of "time pressures," among other considerations, in concluding that a mistaken entry into the wrong house could not be deemed reasonable as a matter of law). Under these circumstances, the Court finds that Detective DeWeese is not entitled to summary judgment in his favor on the reasonableness of his mistaken entry into Plaintiffs' apartment.

**(b)    Lieutenant Riopelle**

Lieutenant Riopelle was the officer in charge of the execution of the search warrant obtained by Detective DeWeese. He was not involved in the investigation leading up to the issuance of the search warrant, but rather is charged with liability only for his actions in the execution of this warrant to enter and search Plaintiffs' apartment. Riopelle's claim to qualified immunity from liability for his entry into Plaintiffs' apartment rests upon his contention that he "relied on information supplied by a fellow officer, Defendant DeWeese," in determining that the D.R.A.N.O. team had secured the proper authorization to enter and search Plaintiffs' apartment. (Defendant Riopelle's Motion, Br. in Support at 10.)

As Plaintiffs correctly observe, however, there is a fundamental flaw in Lieutenant Riopelle's claim of reliance upon information supplied by a fellow member of the raid team. As noted earlier, Lieutenant Riopelle asserted his Fifth Amendment privilege against self-incrimination at his deposition, refusing to answer any questions whatsoever about his actions, conduct, or role in the raid of Plaintiffs' apartment. Under these circumstances, the claim of reliance in Lieutenant Riopelle's motion is based solely on the unsubstantiated assertions of his counsel, without citation to any supporting evidence in the record. Plainly, only Riopelle alone, and no other party, can testify as to the information (if any) he learned from his fellow officers and relied upon as he entered Plaintiffs' apartment.

More generally, the Court explained earlier that a claim of qualified immunity is to be assessed on the basis of the information known to an officer at the time of the actions

at issue. Yet, the record is utterly silent as to what facts Riopelle knew as he entered Plaintiffs' apartment. Indeed, and as Plaintiffs point out, because Riopelle has invoked his Fifth Amendment privilege against self-incrimination in a civil suit, a trier of fact is entitled to draw an adverse inference from this assertion of privilege. *See, e.g., Nationwide Life Insurance Co. v. Richards,* 541 F.3d 903, 911 (9th Cir. 2008); *In re High Fructose Corn Syrup Antitrust Litigation,* 295 F.3d 651, 663-64 (7th Cir. 2002). Thus, the jury could infer, for example, that Riopelle possessed all of the information known to his fellow D.R.A.N.O. team members — and, most notably, Detective DeWeese — at the time the team executed the search warrant. Having held that Detective DeWeese is not entitled to summary judgment as to the reasonableness of his mistaken entry into Plaintiffs' apartment, it readily follows that Lieutenant Riopelle likewise is not entitled to summary judgment on this issue.

### (c)    Officer Thorburn

The final member of the six-officer D.R.A.N.O. raid team who remains as a defendant in this action is Officer Thorburn of the Allen Park Police Department. Like Lieutenant Riopelle, Officer Thorburn contends — this time, with support in the record — that he entered Plaintiffs' apartment in reliance on facts within the knowledge of, and relayed to him by, his fellow team members: namely, that a warrant had been obtained to search the apartment to which he was led by Detective DeWeese. (*See* Defendant Thorburn's Motion, Ex. B, Thorburn Dep. at 12, 18.)

In *Humphrey v. Mabry,* 482 F.3d 840, 847 (6th Cir. 2007), the Sixth Circuit held

that "where individual police officers, acting in good faith and in reliance on the reports of other officers, have a sufficient factual basis for believing that they are in compliance with the law, qualified immunity is warranted, notwithstanding the fact that an action may be illegal when viewed under the totality of the circumstances." The court further explained that "where one officer's claim to qualified immunity from the consequences of a constitutional violation rests upon his asserted good faith reliance on the report of other officers, we consider: (1) what information was clear or should have been clear to the officer at the time of the incident; and (2) what information that officer was reasonably entitled to rely on in deciding how to act, based on an objective reading of the information." *Humphrey,* 482 F.3d at 848.

Applying these principles here, the Court finds that Officer Thorburn is entitled to qualified immunity from liability for mistakenly entering Plaintiffs' apartment. At the time of this entry, Officer Thorburn had been (correctly) advised that he and his fellow D.R.A.N.O. team members were authorized under a search warrant obtained by Detective DeWeese to search an apartment for evidence of unlawful narcotics activity. (*See* Thorburn Dep. at 13-14.) Thorburn also was aware that this warrant stemmed from an investigation by Detective DeWeese that included "K-9 sniffs" at the subject apartment. (*Id.* at 12.) In addition, when Officer Thorburn arrived at the location of the search, he followed his fellow team members into the apartment building, and then was directed to Plaintiffs' apartment by Detective DeWeese. (*See id.* at 16-18.)

An officer in Thorburn's position could reasonably have relied on all of this

information learned from Detective DeWeese as he raided Plaintiffs' apartment along with his fellow D.R.A.N.O. team members.  First, it would have been reasonable to rely on DeWeese's representation that he had obtained a search warrant that would serve as justification for the raid.  In fact, this representation was entirely accurate, apart from the subsequent (and mistaken) identification of the apartment that the team members were authorized to search.  Next, it would have been reasonable to rely on DeWeese's factual assertions and directions regarding the proper apartment to search, where it was DeWeese's investigation that had led to the issuance of the search warrant, and where DeWeese could be presumed to know the correct location of the suspected narcotics-related activity uncovered in his investigation.

To be sure, DeWeese misidentified this location to his fellow team members as they carried out their raid, directing them to Plaintiffs' apartment rather than the residence identified in the search warrant.  Yet, while the Court has found that there are issues of fact as to whether DeWeese knew or should have known of this mistake, this determination rested upon facts which (a trier of fact could conclude) were known to DeWeese, but which were not known to Thorburn.  Most notably, the jury could find that DeWeese had visited the correct location earlier on the day of the raid, but Thorburn has testified without contradiction that he had never been to this apartment complex.  (*See* Thorburn Dep. at 15.)  More generally, DeWeese had been investigating suspected drug activity at 23231 Williamsburg Circle, Apartment G, for several days, had made records of these activities, and had prepared an affidavit and search warrant for this address that

included a fairly detailed description of the apartment to be searched. Thorburn's only evident knowledge of this address, in contrast, came when DeWeese mentioned it during his pre-raid briefing. Even if he remembered this address as the team carried out its raid, the building actually entered by the team had a similar address, and Thorburn had no reason to doubt that DeWeese knew where he was going. Under these circumstances, the Court finds that Officer Thorburn is entitled to qualified immunity from liability for his entry into Plaintiffs' apartment.

### (d) Officer Ruffner

Officer Ruffner was not a member of the D.R.A.N.O. team, but instead was asked to accompany the team as they executed the search warrant. Officer Ruffner has testified that he drove separately to the apartment complex in a patrol car, that the raid team was already there when he arrived at the complex, and that he witnessed the team walking up to an apartment building. His role was to provide "[o]utside security," meaning that he was to be a uniformed officer standing outside the residence — in this case, either inside or outside of the apartment building as he deemed appropriate. (Defendant Ruffner's and Toler's Motion, Ex. A, Ruffner Dep. at 28-30.) In this role, Ruffner stationed himself outside the door to Plaintiffs' apartment after the D.R.A.N.O. team had broken through the door and entered the premises, and he remained outside the door for less than ten minutes before being advised that he could leave.

Just as with Officer Thorburn, Officer Ruffner was reasonably entitled to rely on the facts relayed to him by Detective DeWeese: specifically, that he and the D.R.A.N.O.

team had secured a warrant to search an apartment for evidence of illegal drug activity. As for the specific location of this search, Ruffner testified that he did not rely on any information relayed by a fellow officer, but instead simply went into the building that the D.R.A.N.O. team had entered.  (*See* Ruffner Dep. at 47.)  Ruffner surely could have reasonably inferred from this observation that the team had entered the building specified in the search warrant, and that he likewise was authorized to follow the team into this building.

To be sure, Ruffner has testified that he possessed some additional information beyond that known by, for example, Officer Thorburn.  In particular, Ruffner was aware that Stephen Shaw was the target of Detective DeWeese's investigation, and he also knew where Shaw lived.  Thus, when Officer Ruffner traveled to the location of the raid in his patrol car, he testified that he knew where to go because he "knew where Shaw lived." (*Id.* at 45-46.)  Moreover, he testified that a question arose in his mind as to whether the D.R.A.N.O. team had raided the wrong apartment because he knew that Shaw did not reside in the apartment entered by the team.  (*See id.* at 49-50.)

Nonetheless, the Court finds that these additional facts known to Officer Ruffner do not defeat his entitlement to qualified immunity.  As he testified at his deposition, Ruffner was not certain that the D.R.A.N.O. team had entered the wrong apartment, because he had not seen the search warrant and did not know what location it listed.  (*See id.* at 49.)  Ruffner further testified that, for all he knew, DeWeese's investigation "may have taken [him] to a different apartment, where Shaw may have lived."  (*Id.* at 54.)

While he might have been unsure or harbored misgivings on this point, he nonetheless could have reasonably relied on the (presumably superior) knowledge of Detective DeWeese and the other D.R.A.N.O. team members as to the proper location of the search. Moreover, even if he had conveyed his misgivings to his fellow officers, the team had already begun to enter the premises when he arrived on the scene, and it would have been too late to prevent them from doing so.[16]  Finally, it bears emphasis that Officer Ruffner never actually entered Plaintiffs' apartment, and that the D.R.A.N.O. team had already raided the apartment before he stationed himself outside the door, making it difficult for Plaintiffs to prevail on a claim that he engaged or participated in an illegal warrantless entry into their home.[17]  Consequently, the Court finds that Officer Ruffner is entitled to summary judgment in his favor on this claim.

### (e) Officer Toler

Like Officer Ruffner, Officer Toler was not a member of the D.R.A.N.O. raid

---

[16]In any event, while Plaintiffs suggest that Ruffner owed a duty to disclose his misgivings to the raid team, they have not identified any legal authority for this posited duty.

[17]To the extent that Plaintiffs contend that a police officer may violate the Fourth Amendment by merely "facilitating" such a violation by other officers, and that a physical intrusion is not essential to establishing such a violation, the cases they cite for these propositions are readily distinguishable.  *See Soldal v. Cook County,* 506 U.S. 56, 62-65, 113 S. Ct. 538, 544-45 (1992) (confirming that the Fourth Amendment may be violated through the unlawful seizure of property, even absent an infringement of privacy or liberty interests); *Dixon v. Lowery,* 302 F.3d 857, 867 (8th Cir. 2002) (finding that the defendant officers were not entitled to qualified immunity where there was "no meaningful distinction between the situation in *Soldal* [involving an actual seizure of property] and the one before us").  In any event, as a purely factual matter, the Court fails to see how Ruffner could have "facilitated" a violation that occurred before he arrived on the scene.

team, but instead was asked to serve as the K-9 officer for the raid, bringing his dog Jax along and checking for the odor of narcotics as requested by the raid team. Toler traveled separately to the apartment complex, arriving at about the same time as the D.R.A.N.O. team. Upon his arrival, Toler waited outside the apartment building for about five minutes, and then went inside Plaintiffs' apartment when signaled to do so. As he and his dog Jax entered Plaintiffs' apartment, Toler was instructed to proceed to the bedroom, where Jax gave a positive indication for the odor of narcotics on a dresser at the foot of the bed. Toler reported this alert to another officer in the bedroom, and perhaps to Detective DeWeese or Lieutenant Riopelle as well, and he then left the premises upon being advised that no further assistance was required.

As with Officers Thorburn and Ruffner, Officer Toler was reasonably entitled to rely on the facts relayed to him by Detective DeWeese regarding the existence of a warrant to search an apartment for evidence of illegal narcotics-related activity. Yet, he also possessed certain additional information not known to these other officers. In particular, Toler had accompanied DeWeese on two earlier trips to the apartment that was the target of DeWeese's investigation, and he and his dog Jax had gone to the door of this apartment on each of these two prior occasions. Thus, as Toler explained at his deposition, although he was told the address of the apartment that the D.R.A.N.O. team intended to search, it was not necessary for him to rely on this information because "it was the same building that [he] had been to twice" before. (Defendant Ruffner's and

Toler's Motion, Ex. C, Toler Dep. at 117-18.)[18]

The question becomes, then, whether these additional facts known to Officer Toler defeat his claim to qualified immunity by rendering unreasonable any belief that he was authorized to enter Plaintiffs' apartment.  Certainly, he had more opportunities than, say, Officer Thorburn to detect a discrepancy between the address that DeWeese had identified as the target of his investigation (23231 Williamsburg Circle) and the address being raided by the D.R.A.N.O. team (23221 Williamsburg Circle).  Moreover, the Court has determined that issues of fact remain as to the accuracy of DeWeese's testimony that the two earlier dog sniffs were conducted outside Plaintiffs' apartment and not Shaw's.  It follows that Toler's testimony on this same point must also be open to question.

Nonetheless, the Court concludes that this factual question does not defeat Officer Toler's entitlement to qualified immunity.  There are two possible resolutions to this question:  either the prior dog sniffs were conducted at Plaintiffs' apartment or they were conducted at Shaw's apartment.  If the former, then Toler's and DeWeese's accounts at their depositions are consistent and correct, but DeWeese's various contemporaneous reports and his search warrant affidavit were inaccurate.  Under these circumstances, Toler could reasonably have relied on DeWeese, the investigating officer, to lead him to the proper address to conduct the two dog sniffs.  Moreover, he (unlike Officer Ruffner) lacked any additional information about DeWeese's investigation or the individual,

_____

[18]As noted earlier, this testimony is consistent with DeWeese's assertion at his deposition that the two prior alerts by Toler's dog Jax had occurred at Plaintiffs' apartment, and not Shaw's.

Stephen Shaw, who was suspected of engaging in illegal drug activity at the target premises. Consequently, even assuming he was told the correct address where Shaw resided, this address did not differ significantly from Plaintiffs' address, and Toler had no reason to question whether DeWeese had led him to the proper location to conduct the dog sniffs. What is more, there would have been no cause for concern or reason for Toler to question the raid team's authority when he discovered that the team was executing the search warrant at the very same apartment he had previously visited.

It is also possible, however, that Toler's two prior visits were to Shaw's apartment, and not Plaintiffs'. In this event, Toler's suspicions could have been aroused when the D.R.A.N.O. team executed the search warrant at a different apartment, and he could have discovered this mistake before entering Plaintiffs' apartment himself. Yet, Toler has expressly testified that no such suspicions were aroused in his mind because, in his view, he and the D.R.A.N.O. team entered the same apartment where he had conducted the two prior dog sniffs. (*See* Toler Dep. at 123-24.) Under this view of the record, of course, Toler's belief on this point would be mistaken. Nonetheless, the Court concludes as a matter of law that any such mistake was objectively reasonable, where Plaintiffs and Shaw lived in nearby buildings with similar addresses and outward appearances, and where Officer Toler lacked any additional or independent information that could have freed him from his reliance on Detective DeWeese to direct him to the proper location to conduct his dog sniffs.

The Court recognizes, of course, that it has reached a different conclusion as to the

objective reasonableness of Detective DeWeese's actions, and that this conclusion is based in part upon a fact that is equally true of DeWeese and Toler: namely, that each of these officers claimed to have visited the site of the raid earlier on the very same day as the raid, under conditions that were not substantially different from those that existed during the raid. Yet, these two Defendants are not similarly situated in other important respects. First and foremost, Detective DeWeese had been investigating suspected drug activity at 23231 Williamsburg, Apartment G for several days, had made records of his activities that consistently referenced this address, and had uncovered evidence — such as confirmation of suspect Stephen Shaw's place of residence, and a physical description of the residence that fairly closely matched Shaw's apartment — that was indisputably linked to this address rather than Plaintiffs'. Officer Toler's involvement in this investigation was far more limited, and was initiated and supervised in each instance by Detective DeWeese, who directed him to the location where his dog Jax was to check for the odor of narcotics. Hence, Officer Toler was not called upon to independently confirm that he was visiting the correct address — and, in fact, he possessed no information (apart from the numerical address of the building) that would have permitted such independent confirmation.

Finally, because DeWeese was solely responsible for conducting the investigation and for preparing the affidavit for a search warrant, he bore sole responsibility for the discrepancy between the address recorded in his reports, the search warrant affidavit, and the search warrant itself (23231 Williamsburg Circle) and the address actually raided by

the D.R.A.N.O. team (23221 Williamsburg Circle).  As stated earlier, if the jury were to

conclude, despite DeWeese's testimony, that DeWeese's and Toler's earlier visits were to

Shaw's apartment and not Plaintiffs', it could infer that DeWeese's contrary testimony on

this point reflected an effort to conceal his blunder in leading the D.R.A.N.O. raid team to

the wrong location.  In the Court's view, no such inference could arise from Toler's

similar testimony on this point, because the other officers had not relied on him to lead

them to the correct location, and he had not been responsible for securing a warrant to

search the correct location of suspected drug activity.  Toler's testimony, even if

mistaken, would not reveal a blunder on his part, but only his mistaken reliance on

DeWeese's directives and his confusion over which apartment he had previously visited.

The Court finds that any such mistake was made in reasonable reliance on information

provided by a fellow officer with superior knowledge of the facts and circumstances

bearing upon the execution of the search warrant, and that Officer Toler is protected by

qualified immunity from any liability arising from this mistaken but reasonable belief.

### 2.    The Search of Plaintiffs' Apartment

The next purported Fourth Amendment violation identified in Plaintiffs' complaint

and subsequent submissions is the search of their apartment pursuant to a warrant that

specified a different location, as well as the continuation of this search even after the

D.R.A.N.O. raid team realized that they had entered the wrong apartment.  Again, the

first prong of the qualified immunity inquiry is straightforward, because "[i]t is a basic

principle of Fourth Amendment law that searches and seizures inside a home without a

warrant are presumably unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.

Ct. 1371, 1380 (1980) (internal quotation marks and footnote with citation omitted); *see*

*also United States v. Chambers,* 395 F.3d 563, 565 (6th Cir. 2005) ("When the police go

to a home with the intention of searching for evidence, they may not forgo a warrant.").

Although the D.R.A.N.O. team had secured a warrant, it did not authorize a search of

Plaintiffs' apartment, and the search conducted by the Defendant officers, therefore, is

properly characterized as "warrantless." *See Pray,* 49 F.3d at 1158-59. Moreover, while

the warrant requirement may be overcome "under extraordinary circumstances" if

justified by exigent circumstances, *Chambers,* 395 F.3d at 565-66, Defendants have

advanced no such claim of exigent circumstances in this case.

Rather, as with Plaintiffs' claim of an unlawful warrantless entry, Defendants'

appeal to qualified immunity with respect to the subsequent search of Plaintiffs'

apartment must rest upon the second prong of the qualified immunity inquiry: namely,

whether "a reasonable officer in the defendants' position would . . . understand that [his]

actions were in fact violating the plaintiffs' clearly established constitutional rights."

*Pray,* 49 F.3d at 1159. In the specific context of a mistaken search of a residence

different from the one specified in a warrant, the Sixth Circuit has described this prong of

the qualified immunity inquiry as follows:

> The parties agree that the officers were obligated to retreat as soon as
> they knew or reasonably should have known that there was a mistake, i.e.,
> they were in the wrong residence. *See Maryland v. Garrison,* 480 U.S. 79,
> 107 S.Ct. 1013, 94 L.Ed.2d 72 (1986). Thus, we must determine what
> searches and seizures, if any, took place after the mistake was known. It

seems to this court that, as a legal matter, any search or seizure that occurred while the officers were under the mistaken but reasonable belief that they were in fact executing the warrant at the correct residence would be protected by qualified immunity. Conversely, any search or seizure that took place after the officers knew or reasonably should have known that they were in the wrong residence would no longer be protected by qualified immunity. A "reasonable" officer would know that such warrantless searches and seizures would violate the plaintiffs' constitutional rights.

*Pray,* 49 F.3d at 1159 (citation omitted). Accordingly, the Court once again considers in turn whether each Defendant is entitled to qualified immunity under this standard.[19]

### (a)     Detective DeWeese

The Court's earlier analysis of Detective DeWeese's entitlement to qualified immunity as to the initial entry into Plaintiffs' apartment is largely dispositive of his claim to qualified immunity as to the subsequent search of the apartment. As explained, issues of fact remain as to whether Detective DeWeese knew or reasonably should have known from the outset that the D.R.A.N.O. team's entry into Plaintiffs' apartment was unauthorized and unlawful. If the trier of fact were to decide this question adversely to

---

[19]In their responses to Defendants' motions, Plaintiffs appear to suggest that Defendants committed a separate constitutional violation by failing to provide clothing to Plaintiff Cohn as she sat on the couch while the officers searched her apartment. In the Court's view, however, this would merely be a factor in assessing the unreasonableness of the officers' conduct while in the apartment and determining the amount of Plaintiffs' recovery, and such considerations are not relevant to the Court's present inquiry. Regardless of whether Plaintiff Cohn was clothed, the officers' mistaken entry and search under a warrant for a different apartment would just as surely violate the Fourth Amendment, and *Pray* instructs that they may escape liability on qualified immunity grounds only if their mistaken beliefs were reasonable under the circumstances. Thus, there is no need at present to decide whether Defendants' conduct was "more" violative of the Fourth Amendment by virtue of their failure to provide clothes for Plaintiff Cohn while they conducted their search, because Plaintiffs already have identified a sufficient violation of the Fourth Amendment to satisfy the first prong of the qualified immunity inquiry.

DeWeese, it would readily follow that any search or seizure undertaken by DeWeese in Plaintiffs' apartment would not be protected by qualified immunity, as it would have occurred *after* DeWeese "knew or reasonably should have known that [the raid team was] in the wrong residence." *Pray,* 49 F.3d at 1159.

In an effort to avoid this result, DeWeese points to his testimony that the two positive indications for narcotics by Officer Toler's dog Jax occurred outside Plaintiffs' apartment at 23221 Williamsburg Circle, and not Stephen Shaw's apartment at 23231 Williamsburg Circle. In DeWeese's view, then, his mistake was in listing the wrong address (23231 instead of 23221) in the search warrant and accompanying affidavit. Had he properly specified Plaintiffs' address in the affidavit for the search warrant as the location where a trained K-9 had given a positive indication for the odor of narcotics, and had he likewise listed this address in the search warrant itself, DeWeese contends that the D.R.A.N.O. team's search of Plaintiffs' apartment would have been lawfully authorized pursuant to a properly issued search warrant. Viewed in this context, DeWeese asserts that his mistake in *drafting* the search warrant, as opposed to executing it, establishes his reasonableness in searching an apartment (Plaintiffs') that he believed (albeit mistakenly) he had secured the necessary authorization to search.

This argument cannot carry the day here, for two reasons. First and foremost, it requires that DeWeese's version of events in his deposition testimony be accepted as correct. As discussed earlier, there are issues of fact in the record as to whether, as DeWeese has testified, his two prior visits to the location of suspected drug activity with

Officer Toler and his dog Jax led these two officers to Plaintiffs' apartment, or whether, as reflected in DeWeese's contemporaneous reports and subsequent search warrant affidavit, these visits were made to the apartment occupied by Stephen Shaw. It must be left to the trier of fact to decide this question.

In any event, even accepting as true DeWeese's account at his deposition, his affidavit for a search warrant did not rest solely upon the two positive alerts by Officer Toler's dog Jax, but also cited (i) an ongoing investigation of "controlled substance activities out of 23231 Williamsburg Cir Apt G," (ii) a tip DeWeese had received, based on personal knowledge, "that narcotic activity was being conducted at 23231 Williamsburg Cir Apt G," and (iii) DeWeese's confirmation that Stephen Shaw resided at 23231 Williamsburg Circle, Apartment G. (Defendant DeWeese's Motion, Ex. D.) There is no dispute that each of these three statements in the affidavit was properly and accurately directed at Shaw's apartment, and not Plaintiffs'. Under his own testimony, then, DeWeese's mistake was not limited to specifying the wrong address for the two positive drug sniffs, but also encompassed grouping together in a single warrant information that would support a search of two different residences.

What DeWeese's argument boils down to, then, is a claim that he could have properly secured a warrant to search Plaintiffs' apartment, if only he had prepared an affidavit in which he (i) correctly identified this apartment as the location of the two positive drug sniffs, and (ii) omitted the information about Shaw and his apartment that had triggered his investigation in the first instance, but that had no bearing upon the

existence of probable cause to search Plaintiffs' apartment.  DeWeese and his counsel have not identified any authority for the proposition that DeWeese should be entitled as a matter of law to rely on a search warrant he secured despite his misidentification of the location of certain of his investigative efforts, and despite his blending together of information pertaining to two different target locations.  To the contrary, a trier of fact could readily conclude that a reasonable officer in DeWeese's position would have realized that he could not rely on a warrant issued pursuant to such a faulty affidavit (and without the issuing judge's awareness of the affidavit's defects).  Moreover, the law is clear that even if an officer possesses information that would establish probable cause to search — and hence would support the issuance of a warrant — a search of a private residence must nonetheless be conducted pursuant to a warrant, subject only to "jealously and carefully drawn" exceptions that do not apply here.  *Chambers,* 395 F.3d at 565 (internal quotation marks and citation omitted); *see also Payton,* 445 U.S. at 587-88, 100 S. Ct. at 1381 (citing the "long-settled premise that, absent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within").  Accordingly, the Court cannot say as a matter of law that DeWeese had a mistaken but reasonable belief that he was executing a valid warrant to search Plaintiffs' apartment.

Neither can it be said as a matter of law that DeWeese properly "retreat[ed] as soon as [he] knew or reasonably should have known that there was a mistake," *Pray,* 49

F.3d at 1159 — namely, once he realized that the warrant he had secured authorized the search of a different apartment. To the contrary, DeWeese has testified that upon discovering his mistake, he and the other D.R.A.N.O. team members nonetheless **continued their search,** and did not retreat. As justification for this action, DeWeese states that he reported his mistake to the officer in charge, Lieutenant Riopelle, and that he merely followed Riopelle's order to continue the search. Yet, as Plaintiffs point out, the Sixth Circuit has rejected this "just following orders" appeal to qualified immunity, reasoning that the order of a superior officer does not relieve a junior officer of "his responsibility to decide for himself whether to violate clearly established constitutional rights." *Kennedy v. City of Cincinnati,* 595 F.3d 327, 337 (6th Cir. 2010) (internal quotation marks and citation omitted). As stated above, and regardless of Riopelle's directive to the contrary, a reasonable officer in DeWeese's position could not have concluded that it was permissible to continue the search, where DeWeese had realized that the warrant authorized the search of a different apartment, and where "no amount of probable cause c[ould] justify" a warrantless search of Plaintiffs' home absent exigent circumstances. *Chambers,* 395 F.3d at 565 (internal quotation marks and citation omitted). Thus, DeWeese is not shielded by qualified immunity for his role in the search of Plaintiffs' apartment.

### (b) Lieutenant Riopelle

The foregoing analysis as to Detective DeWeese applies as well to Lieutenant Riopelle. As discussed earlier, Riopelle's decision at his deposition to invoke his Fifth

Amendment privilege against self-incrimination would permit a trier of fact to draw an adverse inference as to any matter about which he declined to testify, and this, in turn, would permit a trier of fact to infer that Riopelle possessed all of the information known to Detective DeWeese. As explained with respect to DeWeese, a trier of fact could conclude that a reasonable officer armed with this information would have known at the outset that the search of Plaintiffs' apartment was not authorized by a warrant to search this location. Likewise, a trier of fact could conclude that Riopelle acted in violation of clearly established law when he failed to leave the premises, and instead ordered his fellow officers to continue their search, even after he was advised by DeWeese that the warrant he had obtained authorized the search of a different apartment.

### (c) Officer Thorburn

Once again, the Court's analysis regarding Officer Thorburn's initial entry into Plaintiffs' apartment is largely determinative of the question whether he is entitled to qualified immunity from liability for his subsequent search of the apartment. As discussed earlier, an officer in Thorburn's position could reasonably have relied on the information relayed by Detective DeWeese to conclude that the entry into Plaintiffs' apartment was lawful. Yet, according to Officer Thorburn's deposition testimony, once he entered the apartment, he immediately proceeded to the bedroom and secured and searched this area until he was told by Lieutenant Riopelle to put everything back and go. Thus, nothing he learned upon entering the apartment would have overcome his permissible reliance on what DeWeese had told him, nor was he given any additional

information from which he could or should have realized that the D.R.A.N.O. team had mistakenly entered Plaintiffs' apartment pursuant to a warrant that authorized the search of a different residence. Although DeWeese advised Riopelle of this mistake, there is no evidence that Thorburn participated in or overheard this conversation, or that its substance was relayed to Thorburn as he searched the bedroom.

Plaintiffs argue, however, that there are a number of reasons why Thorburn should have realized he was in the wrong apartment, including (i) Stephen Shaw's absence from the apartment, (ii) an unexpected female's presence in the apartment, (iii) a portrait of this woman with a man who looked nothing like Shaw, and (iv) the absence of any papers or other materials in the apartment relating to Shaw. Yet, nothing in the record indicates that Thorburn was ever advised, whether in DeWeese's pre-raid briefing or otherwise, that the target of the raid was Stephen Shaw, or that only Shaw and no-one else was expected to be present in the apartment. Neither is there evidence that Thorburn was previously familiar with Shaw or knew what he looked like. Accordingly, none of the facts cited by Plaintiff could be expected to have alerted Thorburn to the possibility that he and the raid team had entered and searched the wrong apartment. It follows that Thorburn is protected by qualified immunity for the search he conducted while "under the mistaken but reasonable belief that [he was] in fact executing the warrant at the correct residence." *Pray,* 49 F.3d at 1159.

### (d) Officer Ruffner

As discussed earlier, Officer Ruffner remained outside the apartment at all times,

stationing himself outside the door after the D.R.A.N.O. team had entered the premises, and departing from this post less than ten minutes later. There is no evidence that he learned any additional information during this time that would (or should) have led him to conclude that the raid team had entered the wrong apartment. Moreover, Officer Ruffner did not enter Plaintiffs' apartment, and thus did not participate in the search of this apartment. Consequently, the Court finds that he is entitled to summary judgment in his favor on Plaintiffs' claim of an unlawful warrantless search of their apartment.

### (e)  Officer Toler

Finally, as with Officers Thorburn and Ruffner, the qualified immunity analysis as to Officer Toler's role in the search of Plaintiffs' apartment flows directly from the Court's earlier discussion of the initial entry into the apartment. Officer Toler was in the apartment only briefly. During this time, he took his dog Jax back to the bedroom as directed, led the dog around the bedroom to sniff for the odor of narcotics, and reported to one or more members of the D.R.A.N.O. raid team that Jax had given a positive indication for an odor of narcotics on a dresser in the bedroom. The record indicates that around the same time he made this report, Detective DeWeese had realized that there was a discrepancy between the apartment specified in the search warrant and the apartment the D.R.A.N.O. team had entered, and he was relaying this discovery to Lieutenant Riopelle as the officer in charge. Yet, there is no evidence that Officer Toler was told or otherwise learned of this mistake before he had already completed his limited role in the search of Plaintiffs' apartment, nor that he observed anything while in the apartment that

would or should have alerted him to this mistake.  Consequently, given the Court's earlier conclusion that a reasonable officer in Toler's position could have believed he was authorized to enter Plaintiffs' apartment, Toler did not learn anything in his limited time in the apartment that would have rendered this belief unreasonable or given rise to an obligation to abandon his narrowly circumscribed involvement in the search.  It follows that Officer Toler is protected by qualified immunity from liability for his participation in the search.

### 3.     The Seizure of Papers from Plaintiffs' Apartment

The final constitutional violation identified by Plaintiffs in support of their federal § 1983 claim is the seizure of papers from their apartment during the course of the raid.  It is clear that such a warrantless seizure from a private home would violate the Fourth Amendment.  Moreover, the second prong of the qualified immunity analysis would be essentially the same as the analysis conducted above with respect to the search of Plaintiffs' apartment:  namely, each Defendant would be entitled to qualified immunity only if, at the time of any seizure, this particular officer was "under the reasonable but mistaken belief that [he was] in fact executing the warrant at the correct residence." *Pray,* 49 F.3d at 1159.[20]

---

[20]The record indicates that the papers seized from the apartment fell within one of the categories of materials subject to seizure under the search warrant:  namely, "items establishing ownership, control, occupancy, or possession of" the apartment.  (Defendant DeWeese's Motion, Ex. E, Search Warrant.)  Thus, the warrant would have authorized the seizure of these papers, but for the fact, of course, that the warrant authorized the search of a different apartment.  As a result, the search of the apartment and the seizure of papers stand on equal footing for purposes of a qualified immunity analysis, with the dispositive question being whether a given officer had

The only remaining question as to the seizure, then, is whether a given Defendant officer actually seized materials from Plaintiffs' apartment during the search. The only evidence in the record on this point is Detective DeWeese's supplemental incident report, in which he identifies himself as the officer who seized residency-related papers from Plaintiffs' apartment. (*See* Defendant DeWeese's Motion, Ex. B, Supplemental Incident Report at 2.) Accordingly, only DeWeese, and not the other Defendants, can be held liable for any unlawful seizure of papers from the apartment. In addition, the Court's earlier discussion confirms that DeWeese is not entitled, at least as a matter of law, to qualified immunity from liability for any such seizure. The remaining Defendants, however, are entitled to summary judgment in their favor on this claim.

## C. Plaintiffs' State-Law Tort Claims

### 1. Governmental Immunity Under Michigan Law

In Counts II and III of their first amended complaint, Plaintiffs have asserted state-law claims of defamation and intentional infliction of emotional distress. The parties agree that under Michigan's Governmental Tort Liability Act ("GTLA") as recently construed by the Michigan Supreme Court, the Defendant officers are immune from liability under the two intentional tort theories asserted by Plaintiffs if, among other elements, their actions "were undertaken in good faith, or were not undertaken with

a mistaken but reasonable belief that the execution of the warrant at Plaintiffs' apartment was proper.

malice." *Odom v. Wayne County,* 482 Mich. 459, 760 N.W.2d 217, 228 (2008).[21]  In

*Odom,* 760 N.W.2d at 225 (quotation marks and footnotes with citations omitted), the

court cited language from earlier decisions describing "a lack of good faith as malicious

intent, capricious action or corrupt conduct or willful and corrupt misconduct."

---

[21]The immunity afforded under the GTLA is further limited to actions that "were discretionary, as opposed to ministerial." *Odom,* 760 N.W.2d at 228.  In their responses to Defendants' motions, Plaintiffs suggest that the Defendant officers were performing ministerial rather than discretionary acts to the extent that they merely had to execute a search warrant previously obtained by Detective DeWeese.

The Court cannot agree.  As the Michigan Supreme Court has explained, "[d]iscretionary acts require personal deliberation, decision and judgment," and discretion "implies the right to be wrong." *Odom,* 760 N.W.2d at 226 (internal quotation marks and footnotes with citations omitted).  As examples of discretionary acts, the court cited a police officer's determinations "whether there is reasonable suspicion to investigate or probable cause to arrest."  760 N.W.2d at 226.  In contrast, the court cited the "complet[ion] [of] activity logs and police reports" as ministerial acts that leave "little or no choice" in their execution.  760 N.W.2d at 226 (internal quotation marks and footnote with citation omitted).  This Court is confident that the alleged acts giving rise to Plaintiffs' claims in this case lie on the discretionary side of this divide, where the execution of a search warrant to enter and search a private home is not a purely mechanistic task, but rather requires a number of judgments along the way as to the precise manner in which the warrant will be executed and the search will be performed, and with each of these judgments, in turn, dependent upon the circumstances confronted by the officer at the moment.  Indeed, Plaintiffs' claims here rest in no small part upon the premise that, in light of the circumstances confronted by the Defendant officers as they executed the search warrant, they should have promptly realized they had entered the wrong apartment and immediately retreated.  Plainly, such a retreat would have resulted from an exercise in judgment that Plaintiffs fault the officers for failing to make.

Finally, the Court observes that its determination on this point is confirmed by the ruling in *Pray,* 49 F.3d at 1157, 1159, which recognizes as a threshold matter that qualified immunity is available only to "[g]overnmental officials who perform discretionary functions," and which then proceeds to hold that the defendant police officers in that case were entitled to qualified immunity for their mistaken but reasonable belief that they were entering the residence identified in the search warrant they were executing.  If the execution of the search warrant in *Pray* had been wholly ministerial, the executing officers would not have been entitled to qualified immunity, and would not have had what the Michigan Supreme Court termed the "right to be wrong."  The same holds true under the similar facts presented here.

In light of its analysis on the issue of qualified immunity, the Court readily concludes that Officers Thorburn, Ruffner, and Toler are entitled to immunity from liability under the GTLA for the state-law tort claims asserted by Plaintiffs. In determining that these officers are entitled to qualified immunity from liability under Plaintiffs' federal § 1983 claims, the Court has found that a reasonable officer in these Defendants' position could permissibly (albeit mistakenly) have believed that the entry into and search of Plaintiffs' apartment was properly authorized by the warrant secured by Detective DeWeese. Although the "good faith" standard under the GTLA differs from the § 1983 qualified immunity standard in that it is measured subjectively rather than objectively, the Court nonetheless concludes as a matter of law that the actions of Officers Thorburn, Ruffner, and Toler meet this standard of subjective good faith, and could not be deemed by a trier of fact to be malicious, capricious, or corrupt. As discussed earlier, these officers reasonably relied on information conveyed to them by the investigating officer, Detective DeWeese, and there is absolutely no evidence in the record that any of them acted with malice, caprice, or corrupt motives by, for example, ignoring clear indicia that the information provided by DeWeese was wrong or that they lacked authority to take the actions they did. Accordingly, the Court finds that these three Defendants enjoy immunity from tort liability under the GTLA.

By the same token, the Court finds that its earlier rulings on the issue of qualified immunity foreclose a determination as a matter of law that Detective DeWeese and Lieutenant Riopelle are entitled to immunity under the GTLA. As explained above, a

jury could infer that Detective DeWeese fabricated an after-the-fact version of events in order to cover for a blunder in his identification of the proper apartment to search. If so, a jury could further find that the actions taken by DeWeese after he realized his mistake were not undertaken in good faith, but instead were intended for the self-serving purpose of shielding himself from blame, and without regard for the additional harm inflicted upon Plaintiffs as a result of this cover-up. These issues must be left for the trier of fact.

Finally, Lieutenant Riopelle cannot hope to meet his burden of establishing his entitlement to immunity under the GTLA, *see Odom*, 760 N.W.2d at 227-28 (confirming that "the burden continues to fall on the governmental employee to raise and prove his entitlement to immunity as an affirmative defense"), where his invocation of his Fifth Amendment privilege has resulted in a record bereft of evidence as to the actions he took and the good faith (or lack thereof) with which he undertook these actions.

### 2. Plaintiffs' Defamation Claim

Plaintiffs' claim of defamation in this case rests upon allegations that the Defendant officers made false statements that were published in the News-Herald account of the raid of Plaintiffs' apartment.[22] Under Michigan law, a claim of defamation includes the following elements: "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least

---

[22]Plaintiffs concede in their response to the summary judgment motion filed by Officers Ruffner and Toler that they are no longer pursuing their defamation claim against these two Defendants. Accordingly, even if Ruffner and Toler were not entitled to immunity under the GTLA, the defamation claims asserted against them would be subject to dismissal.

to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication." *Mitan v. Campbell,* 474 Mich. 21, 706 N.W.2d 420, 421 (2005). In their summary judgment motions, Defendants DeWeese and Riopelle challenge Plaintiffs' defamation claim on the grounds (i) that there is no evidence that either of these officers spoke to a News-Herald reporter or anyone else in the media regarding the raid on Plaintiffs' apartment, (ii) that Plaintiffs have failed to identify any defamatory statements in the News-Herald article, and (iii) that there is no evidence that DeWeese or Riopelle acted with the requisite "actual malice" — that is, that they made any defamatory statements "either with knowledge of their falsity or with reckless disregard for their truth or falsity." *Dienes v. Associated Newspapers, Inc.,* 137 Mich. App. 272, 358 N.W.2d 562, 565 (1984).[23]

Beginning with the first of these challenges, Defendants note that the News-Herald article quotes only Lieutenant Darwin Scott of the Michigan State Police, and none of the Defendant officers, in its account of the raid. Yet, as expressly noted in the article, Lieutenant Scott acknowledged that he was not present at the raid, and that his statements regarding what had occurred were based upon information relayed to him by the D.R.A.N.O. raid team. As Plaintiffs correctly observe, the requisite "publication" of a defamatory statement occurs when it is communicated to "any person other than the one

_____

[23]For present purposes, at least, Plaintiffs accept this "actual malice" standard as applicable here.

libeled," *Ball v. White,* 3 Mich. App. 579, 143 N.W.2d 188, 190 (1966), and once this "publication" has occurred, the publisher of the statement "is liable for the injurious consequences of its repetition where the repetition is the natural and probable result of the original publication," *Tumbarella v. Kroger Co.,* 85 Mich. App. 482, 271 N.W.2d 284, 290 (1978).  Lieutenant Scott confirmed at his deposition that the information he provided to the News-Herald reporter derived, at least in part, from details of the raid he had heard from Defendants Riopelle and DeWeese.  (*See* Plaintiffs' Response to Defendant DeWeese's Motion, Ex. 22, Scott Dep. at 30-31, 35, 40-41, 49-50.)  Accordingly, it must be left to the trier of fact to decide whether Lieutenant Scott's repetition to the News-Herald reporter of what he had learned from Riopelle and DeWeese was the natural and probable result of the initial statements by these Defendant officers to Lieutenant Scott about what had transpired during the raid.

Defendants' remaining challenges require little discussion.  While Defendants question whether the News-Herald article contained any defamatory statements, the article reported, among other things, Lieutenant Scott's assertion that the D.R.A.N.O. team "still had probable cause to search [Plaintiffs'] residence" because "a police dog indicated there were drugs in their apartment on two occasions."  (Defendant DeWeese's Motion, Ex. H.)  Accusations of criminal activity are deemed defamatory *per se* under Michigan law.  *See* Mich. Comp. Laws § 600.2911(1); *Tumbarella,* 271 N.W.2d at 289.[24]

---

[24]In light of this accusation, the Court fails to see how Defendant DeWeese can tenably assert in his summary judgment motion that any misstatements of fact in the News-Herald article

Next, the Court has already found that issues of fact remain as to the truthfulness of Detective DeWeese's claim that the prior dog sniffs had been conducted at the door of Plaintiffs' apartment, as opposed to Shaw's apartment, and as to whether DeWeese concocted this version of events after the fact in an effort to conceal his mistake in leading the D.R.A.N.O. team to the wrong address. Thus, a jury could conclude that the claim of a police dog's prior detection of drugs at Plaintiffs' apartment was made with knowledge of its falsity or with reckless disregard for its truth or falsity.

were merely "minor inaccuracies." (Defendant DeWeese's Motion, Br. in Support at 15.)

### 3.    Plaintiffs' Claim of Intentional Infliction of Emotional Distress

Finally, Count III of Plaintiffs' complaint asserts a claim of intentional infliction of emotional distress.  The Michigan Supreme Court "has not officially recognized" this tort, but "[a]ssuming that the cause is valid," a plaintiff must show "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Vanvorous v. Burmeister,* 262 Mich. App. 467, 687 N.W.2d 132, 141-42 (2004) (internal quotation marks and citations omitted).  "Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Garretson v. City of Madison Heights,* 407 F.3d 789, 799 (6th Cir. 2005) (internal quotation marks and citation omitted).  "Liability will not be found for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities; rather, the case must be one in which the facts would arouse the resentment of an average member of the community against the actor, leading him to exclaim, 'Outrageous!'" *Garretson,* 407 F.3d at 799 (internal quotation marks and citations omitted).

Viewing the record in a light most favorable to Plaintiffs, the Court cannot say that the conduct of Defendants DeWeese and Riopelle is properly characterized as extreme, outrageous, or atrocious.  Even under Plaintiffs' preferred reading of the record, the D.R.A.N.O. team's initial entry into Plaintiffs' apartment was merely mistaken, and not a deliberate invasion without any pretense of lawful authority, and the dispute between the

parties largely turns upon how obvious this mistake was or should have been. In addition, the raid lasted only about 30 minutes, and while Plaintiffs' personal effects were strewn about, no permanent property damage was done[25] and no physical injury was inflicted. The conduct that Plaintiffs identify as most outrageous is Detective DeWeese's purported fabrication of prior dog sniffs at Plaintiffs' apartment in order to cover up or minimize his mistake, as well as the dissemination of this allegedly fabricated story to a local newspaper. While this conduct, if found to have occurred by the trier of fact, certainly would be far from commendable, the Court finds that it falls short of the extreme, outrageous, or atrocious misconduct necessary to sustain a claim of intentional infliction of emotional distress. Accordingly, Defendants are entitled to summary judgment in their favor on this claim.

## IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant DeWeese's February 26, 2010 motion for summary judgment (docket #89 in Case No. 09-12187) is GRANTED as to Plaintiffs' claim of intentional infliction of emotional distress, but is otherwise DENIED. Similarly, Defendant Riopelle's April 30, 2010 motion for summary judgment (docket #111 in Case No. 09-12187) is GRANTED as to Plaintiffs' claim of

---

[25]The door to the apartment was broken, but Detective DeWeese subsequently contacted the apartment management and advised them that the door needed to be repaired, and this evidently was done.

intentional infliction of emotional distress, and also as to the portion of Plaintiffs' federal § 1983 claim arising from the seizure of papers from their apartment, but is otherwise DENIED.

Next, Defendant Thorburn's January 26, 2010 motion for summary judgment (docket #77 in Case No. 09-12187) is GRANTED. Likewise, Defendants Ruffner and Toler's February 25, 2010 motion for summary judgment (docket #11 in Case No. 09-14341) is GRANTED. In light of these rulings, Plaintiffs' federal § 1983 claims and their state-law claim of defamation in Case No. 09-12187 will go forward against Defendants DeWeese and Riopelle only, and a judgment of dismissal will be entered in Case No. 09-14341.

SO ORDERED.

s/Gerald E. Rosen
Chief Judge, United States District Court

Dated: September 30, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 30, 2010, by electronic and/or ordinary mail.

s/Ruth A. Gunther
Case Manager